Good morning. May it please the Court. This case centers upon a hospital's termination of its contractual relationship with a staffing company because the staffing company, on multiple occasions, sent a qualified African-American prep cook to work in the hospital's kitchen after the hospital's chef, on multiple occasions, had requested only a Hispanic worker. Methodist Hospitals seeks to avoid any liability on account of its discriminatory acts by arguing, first, that White Glove, as a non-minority-owned business, lacks standing to bring claims for discrimination under Section 1981, and, second, that White Glove did not oppose the discriminatory acts and thus cannot bring a retaliation claim under the same statute. In terms of discrimination under Section 1981, the sole issue for the Court is whether White Glove, as a non-minority-owned business, has statutory standing to bring a discrimination claim. While several other circuits have articulated varying standards, to date, neither the Fifth Circuit nor the Supreme Court have addressed the issue. Of the circuits that have addressed the issue, the D.C. Circuit and Tenth Circuit have adopted the best-reasoned approach, which is that if a corporation can suffer harm from discrimination, it has standing to litigate that harm. That's from Gershwin. It bears noting that almost all of the cases addressing statutory standing under Section 1981 were decided before Lexmark in 2014, and Lexmark may very possibly obviate the discussion altogether. In terms of White Glove's retaliation claim, the issues presented here are, one, whether Title VII's purposive opposition requirement applies to a non-employment-related claim brought under Section 1981, and, even if it does apply, whether a reasonable jury could find that White Glove's conduct here amounted to purposive opposition. First to the standing issue. The text of 42 U.S.C. Section 1981 reads, All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by White citizens. Now, that was enacted over 100 years ago. What the Supreme Court in Dominoes said that this means is that Section 1981 functions as follows. It protects the equal right of all persons to make and enforce contracts without respect to race. Justice Scalia went on in that opinion to explain that the Court has never retreated from what should be obvious from reading the text of the statute. Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship as well as when it impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship. So the focus is on the right to contract without regard to race. What relief do you seek? What relief do we seek? Well, we seek the case being remanded back to the district court, and then we can have a trial. Ultimately, what relief do you seek? So damages based on the termination of White Glove's contract with Methodist Hospital. Or the failure to enter into a contract. That's right. So there's some factual issues around that, Your Honor. Ultimately, from a merits standpoint, that will matter at the district court. I'm just trying to figure out if you want damages or injunctive relief. I'm just trying to see what you're saying. No, it's damages, Your Honor. The contract was terminated. Is that chef still there at Methodist Hospital? As of the time of the depositions, he was, Your Honor. I don't know if he's still there. I mean, I think it's just shocking that they're keeping someone that's discriminating, regardless of whether you have standing to raise it. It's just a shocking thing that this is going on, and that they're maintaining the chef in their employment after he's made such comments. But that's neither here nor there. Yes, Your Honor. So Judge Sintel and Gersman, speaking for a panel of the D.C. Circuit, explained that the determination whether a corporation has a racial identity is not determinative of whether that corporation has standing to bring a discrimination claim. Rather than assume that racial identity is a predicate to discriminatory harm, we might better approach the problem by assuming that if a corporation can suffer harm from discrimination, it has standing to litigate that harm. Judge Clay also brought a claim. I saw that it's settled. But if both claims were to go forward, let's say the individual, Ms. Clay, and the company, would there be a double recovery problem, and what would the different damages be? So there's multiple nuances to that question, Your Honor. So first, under Domino's and Body by Cook, and there's several cases, even Gersman, the individual plaintiff did not have standing to bring the claim because it wasn't their contract that was impaired. So Ms. Clay could not sue on behalf of White Glove's terminated contract, the future damages they expected, things like that. It's a little unique here, though. But she, I guess I don't know how the company exactly works. I take it you only get paid if you're sent out for a day? So it's a staffing company, and that is the unique nuance here, Your Honor. So if she's an employee and she's not sent out for a couple days, maybe that's... That's right. She would recover. Yes, Your Honor. And then there's an additional issue that since it's a staffing company, White Glove very well could have sent her to another job the next day, and that her multiple employees go into Methodist Hospital. So there's, you know, it wasn't addressed below. Methodist never challenged whether she had seen it in 1981. I think there's big questions if she did, but she technically has her relationship with White Glove and anticipated making money based on that. And she's still with them, or at least she stayed with them sometime after this? So, again, I don't know about today, and the record's a little fuzzy. I believe that she eventually moved to Kansas, and so it doesn't work for them any longer. But they didn't fire her or anything like that? No, Your Honor. I don't believe that's in the record at all that they fired her. I think the record is that she was qualified. They hired her in the first place and were happy with her work. So in the Gersman case specifically, a corporation, CSI, brought a Section 1981 discrimination claim against another business, GHA, that had ended its contractual relationship with The trial court found that neither Gersman, the individual, or CSI, the company, had standing. Judge Sentelle agreed as to the individual, but he disagreed as to the company. He found that the determination, we went over this, but the determination whether a corporation has a racial identity is not determined. That's the key issue here, is whether you have to have a racial identity or not, because there's no dispute in the record that White Glove is a non-minority owned business. Judge Sentelle noted that if a corporation could have a racial identity, it would be difficult to determine that identity. Well, and the, your counsel opposite cites Village of Arlington Heights, where it says something to the extent of a corporation doesn't have a racial identity, but it was talking about the 14th Amendment. The case there was construing the 14th Amendment. 1981 wasn't even in play in that case, right? I don't believe it was, even if it was. Well, I searched 1981 and it didn't pop up in the case, so I didn't see where it was in play. What was in play was the 14th Amendment, and there could be a difference in construing a statute versus construing the Constitution, right? Yes, Your Honor, for sure. Okay. And I would point, Your Honor, to the Hudson Valley case out of the Second Circuit, and it's at 706 to 707. They discuss at length Arlington Heights and how it doesn't really apply to this analysis and how they think that the Second Circuit at least thought that the Supreme Court would find that no, that Arlington Heights does not preclude a corporate plaintiff from bringing a Section 1981 discrimination claim. And then interestingly, in Domino's Supreme Court opinion, at footnote one, they actually cite that discussion. They say, since the company settled its claims and is not involved in this case, we have no occasion to determine whether as a corporation it could have brought suit under Section 1981. We note, however, that the Court of Appeals to have considered the issue have concluded that corporations may raise Section 1981 claims. And then they cite that specific discussion in Hudson Valley where they're saying that Arlington Heights would not apply. So Judge Sintel felt the better approach to the problem was to assume that racial identity is not to assume that racial identity is a predicate to discriminatory harm, but rather look at whether the corporation suffered harm. And then he cited precedent from the Supreme Court that says that a person need not be a member of a protected minority in order to suffer harm from discrimination. That's that white people can sue under Section 1981 for discrimination that they suffered. He also cited cases from other circuits, including the Fifth Circuit, where a white plaintiff had standing to sue under Section 1981, where that white plaintiff was terminated as an employee because of the race of the employee's The case that Judge Sintel cites is Paraka v. Clements, which is from the Fifth Circuit in 1975. So after concluding that if a corporation can suffer harm from discrimination, it has standing to litigate that harm, the Court found that the facts before it indicated that the contracting party, GHA, discontinued its relationship with CSI solely because an individual associated with CSI was Jewish. Judge Sintel didn't say because the president was Jewish. He says an individual associated with CSI was Jewish. In reaching this decision, the Court specifically noted that whether Gershman was the president did not matter because he says that his analysis would be no different if Gentile shareholders owned CSI and GHA ended the contractual relationship because the corporation had a single Jewish employee. So virtually every circuit agrees that under certain circumstances a business may bring a discrimination claim under Section 1981. Indeed, this circuit, embodied by Cook, tacitly acknowledged that when a business's contract is terminated or impaired on account of race, that business has standing to sue. Now, there wasn't an in-depth discussion of when not. I won't go through all the cases. They're cited at page 20, footnote 6 of our brief, kind of the survey of how the different circuits have addressed the issue. The two I would point out is the Tenth Circuit and Guides Ltd. adopted the Gershman standard and found that a corporation has standing to assert discrimination claims under Section 1981 where such discrimination is based on the race of one of the corporation's employees. Again, not focusing on shareholders or president or an imputed racial identity. So the Ninth Circuit and Thinkit, which I believe is the one that Methodist cites in their brief and is cited in our brief as well, it differs from Gershman slightly. It's self-reliant on Gershman. The Ninth Circuit has adopted what appears to be a broader either-or standard. They hold that if a corporation either suffers discrimination harm, cognizable under Section 1981, or has acquired an imputed racial identity, it is sufficiently within the statutory zone of interest to have prudential standing. So in the same decision, the Ninth Circuit later clarifies that imputed racial identity is not required to bring a claim. After discussing Gershman, it says that as an independent standing rationale, when a corporation experiences direct discrimination injury, it falls within the prudential zone of interest protected under Section 1981. And here the corporation has alleged such an injury. So now turning to the retaliation claim. The sole issue for purposes of appeal is whether White Glove purposefully opposed Methodist discriminatory behavior. As an initial matter, the court need not even reach that question because purpose of opposition is not a necessary element of a retaliation claim under Section 1981. Purpose of opposition comes from the text of Title VII and should not be read into 1981. We've repeatedly said that 1981 and Title VII should be read parallel. I mean, that's why, you know, McDonnell Douglas gets imported into 1981. There's a number of cases saying they should be read parallel, which also eliminates some confusion. But why shouldn't this part of Title VII be treated, you know, imported into 1981? So in almost all cases it should be, Your Honor. But here we're dealing with a non-employment retaliation claim. You can't have that in the Title VII context. We're not talking about an employment relationship. We're always talking about an employment relationship. Here between White Glove and Methodist, there's no employment relationship. And so it's a non-employment retaliation claim. I would point out that— The court below did treat it under Title VII, though, and said it didn't pass muster. I guess that's why you don't like to use that standard. That's correct, Your Honor. And I'll address why I think the court below was wrong. But this court, the Fifth Circuit in Zastrow, acknowledged that there were non-employment retaliation claims. They said that non-employment retaliation claims under Section 1981 are exceedingly rare, but they nevertheless do exist. And then the court announces the elements for a non-employment retaliation claim under Section 1981. And that is, first, that the plaintiff engaged in activities protected by Section 1981. Second, that an adverse action followed. And third, the existence of a causal connection between the protected activities and the adverse action. So the first element is what goes to potentially the purpose of conduct. I would argue that the plaintiff engaged in activities protected by Section 1981 does not bring in the statutory language of Title VII. Why should it be treated differently? Again, so what they're looking for in the employment context is whether the employee purposefully opposed the discrimination. Here in the non-employment context, all we have is you're looking at, okay, did White Glove exercise its rights, its protected activities under Section 1981, that is, its right to contract directly with Methodist and its ability to contract directly with Ms. Clay. I don't think there can be any dispute that its ability to contract with either of those parties was— But then what distinguishes retaliation from just the plain old 1981? So, okay, so plain old discrimination is that our—well, okay. So the key is the contract with Ms. Clay, right? So White Glove cannot sue Methodist on the basis of it impairing its contract with Ms. Clay because Methodist was not a party to that contract with White Glove. Well, how did it impair their contract with Ms. Clay? Because you said they could send her to another job the next day. Assuming there was another job available. If there was no job available, then Ms. Clay doesn't have an opportunity to work for White Glove anymore. She has to go find other work, and she goes—she moves to Kansas. I don't know that that's— How does that harm White Glove? That's where she would have—in your earlier discussion with Judge Costa about what her standing was. If she lost her job because they didn't have anywhere else to send her, then that's where she would have a standing. But how does that hurt them differently than losing the contract with Methodist? And I don't know, Your Honor. I'm having a hard time understanding why corporations should be treated more favorably than an individual employee for retaliation purposes. Why would they have a lower burden of proof? I would say it's just corporations. It's any party's contracting. If an African American went to buy a car and was discriminated against or retaliated against, I don't know that they would be treated any differently than the corporation. Let's move, I guess, to the second part of that. Your focus on the protected activity. It seems to me there's a problem with causation because, I mean, you have— if you have standing on the first issue, you have a pretty strong case of discrimination. They said from the get-go, you better send Hispanics to the kitchen. So it just seems that that's—from the beginning, it was a racial discrimination issue. How can you then show it was a but-for retaliation issue? It's because—so White Glove sent her out several times, even after—so they say send only Hispanics. They send her out, and then the contract is terminated because of that act. So I would say that there's—you can assert both claims based on the conduct. We're not talking about this case specifically. I'm talking about overarching legal principles here. Why should we have an element for individuals under 1983 that is not present in retaliation claims under 1981, when we have said they should be construed congruently? All I would say is that in the nonemployment context, we look at different elements. Why? I don't have a great answer here. Okay. Fair enough. Thank you. Thank you. May it please the Court. Chief Judge Owen, Judge Haynes, Judge Costa, Counsel. A corporation has no racial identity, and therefore it cannot be the direct target of discrimination. Generally, a person is not enabled to assert the rights of third parties. However, in this instance, circuit courts have recognized two near exceptions. The first is where a corporation obtains the imputed racial identity of its shareholders. The second, where the corporation is the only effective adversary to assert the claim. Neither is present in this case. Your premise is that they're asserting a third-party claim. It seems to me they're seeking to recover for their own injury. I mean, their damages would focus on their loss of contract, not Ms. Clay's lost wages. Your Honor, simply because they have a damage does not mean that they have a cause of action. This is what was recognized in Worth v. Sedan. They are essentially attempting to assert a third-party claim based upon— So they might not have a cause of action, but it does seem that whether they do or not, they are asserting harm to them. They're seeking to recover for— You know, third-party standing is typically—the most classic case is an abortion. Like, oh, a doctor or clinic is asserting the rights of the woman seeking an abortion. Here, I mean, the company is the one that lost the contract. They're seeking to vindicate something that happened directly to them. Yes, Your Honor. And I think that you touched on something during an earlier argument as to whether this best characterizes a retaliation claim or a discrimination claim. I think when we look at the factual circumstances, this is really a retaliation claim, and I will show that they did not engage in productive activity that would support that. But if we look at the facts, they're alleging not that White Glove or its shareholders were discriminated against, but they sent on an African-American employee. They were allegedly told that Methodists did not want her anymore and sent her home and to send a Hispanic employee, so then the discrimination is suffered by the employee. And then if White Glove had engaged in purposive opposition, it would have sent her back as an act of protest for that allegedly discriminatory demand. Now, that's not what occurred here, but that sets forth a claim for retaliation under these circumstances. It does not show that White Glove was actually discriminated against in this instance. But they were discriminated against for daring to hire an African-American and send her to a job she was qualified for. Isn't that core discrimination? Respectfully, Your Honor, I disagree. I believe that the fact that Methodists were continuing to engage in contract negotiations with White Glove, with knowledge that they had an African-American employee, and again, this is assuming that this alleged discriminatory remarks were made, shows that they were not discriminated against. So you are denying this? I mean, you're saying the chef didn't say this stuff and that you all didn't try to keep Ms. Clay from working because she's African-American and not Hispanic? Yes, Your Honor, we are. This goes back, it's going to be a fact dispute. As far as the comments that were made, that's correct. But again, it's not a discrimination. But you do agree it's pretty disturbing that Methodist Hospital would be employing a chef like that? Yes, Your Honor, and we do not believe that those remarks were actually made. Okay, and so then why did they not want Ms. Clay? Your Honor, the kitchen is a fast-performing environment, and what happened is sometimes we've got temporary employees that come in, and for whatever reason they can't keep up. And, you know, a lot of times they're brought in for catering or for cooking or, you know, you've got a lot of different stations. It's a very large facility that's servicing patients, it's servicing visitors, and so it is a very, it's a difficult job. But we're not here to talk about the facts. That's correct, Your Honor. Explain to me the law. You're saying it's a matter of law. Yes. A corporation who does not have a, quote, racial identity can't sue under 1981. Is that because of the definition of person? What do you base that on? Your Honor, just so the Village of Arlington Heights decision has been criticized as dicta, but logically it makes sense. A corporation is an entity that has no racial identity. It's a person, though. 42 U.S.C. 15855A4 defines person to include corporation. Yes, Your Honor. So it is a person without a racial identity, and so therefore it cannot be the target of discrimination based upon a racial identity. However, circuit courts have recognized it an exception, and that's where it obtains the— I'm just reading the statute. It says a person shall enjoy the same property as enjoyed by white citizens. That just means every corporation enjoys the same, everything that's in 1981, as enjoyed by white citizens. That doesn't say you have to be of a particular race, does it? That's correct, Your Honor. But to be the subject of— Where do you get this overlay of you have to have a racial identity to sue under 1981? Because the language of the text is to make and enforce contracts free from being the target of discrimination. To be the target of discrimination, you have to have a racial identity. It makes sense. The statute doesn't say that. Your Honor, I'm looking to the Village of Arlington Heights where Justice Powell made the observation that a corporation generally cannot have a racial identity. Was Justice Powell talking about 1981? Your Honor, I do not believe that he was— No, he was talking about the 14th Amendment. If the 14th Amendment had solved all racial discrimination problems, we wouldn't need these multitude of statutes that have been passed ever since. So there has to be some other purpose to 1981 than simply restating the 14th Amendment. So why should—even assuming Arguendo Village of Arlington Heights wasn't dicta, how does that apply to the language of this statute? How do we morph that into the language of this statute? Because I believe the observation stands true that to be the target of discrimination, you have to have a racial identity. Now, a corporation can obtain an imputed racial identity. And courts have recognized that. How does it do that? I mean, what percentage of shareholders have to be of a certain race? And that seems—I think as Judge Sentelle said, that's a tricky business to get into. Yes, Your Honor. But I believe that what we can see—and again, this does relate to the Domino's Pizza observation. When we have a corporation, we're presented with a tricky situation because a corporation can be discriminated against because it's certified as a minority-owned business, it's got a majority of shareholders. If it's discriminated against because someone sees that company as having a person with a minority race and discriminates against that entity on that basis, then the corporation is being targeted. That's what we have here. They saw this corporation as having a person of a particular race that they discriminated against. Your Honor, I respectfully disagree. I believe that this is more akin to a retaliation case, which they do not factually show. But the discrimination that occurred was against Clay. Clay was sent home and told—and apparently White Glove, which allegedly told not to send him— If that's true, then why did they cancel it? The allegations are that Methodist Hospital said, we're not going to enter into a contract with you, White Glove, because we're through dealing with you because you kept sending Ms. Clay. It was based because she was not Hispanic. Whether that's true or not, we don't care. We're looking at the allegations. Yes, Your Honor. There's one situation where we're saying White Glove was discriminated based upon its association with someone that is African American. Now, first of all, I will say that there's no court that has said that a corporation can assert a 1981 discrimination claim based upon the race of a single employee. But regardless, that is not factually the case we have here. Methodist did not terminate contract discussions because White Glove employs an African American employee. White Methodist— They didn't discriminate because they sent an African American employee two or three times to work there. Despite the alle— They did not send a Hispanic. Which would arguably— I don't understand how that helps you. Because the Methodist was not discriminated against White Glove because it employs an African American employee. It was not—there was no discrimination directed towards White Glove, either for hiring an African American employee or for having an African American employee as a shareholder or anything of that nature. The staffing company, the merit of hiring someone is sending them out to do the work. So you're saying, well, hire all the African Americans you want. Just don't send them to our restaurant or our cafeteria. That to me seems like the same thing. I mean, there's no—when you're talking about a temporary staffing agency, they have no independent job. They don't have their own cafeteria to put the person in. They're sending them out to places that need help. It's a busy time at Methodist, let's say, and their cafeteria is overwhelmed or somebody is on leave or something and they need a replacement. That's what temporary staffing does. They fill those needs when someone—a permanent employee is on leave and so forth. If they can't fill those needs because, let's say, everybody in Dallas said we only want people of X race, not Y race, then they would never be able to send the person of Y race anywhere. That's the problem, right? Yes, Your Honor, but I think that the remedy is that there is a remedy for the discrimination. The reason that we have not seen a court grant imputed identity to a corporation based upon the race of its employee is because the employee can assert the discrimination claim on his or her behalf. But couldn't this have helped White Glove having lost this big contract? I mean, Methodist Hospital is a big place. Presumably, they're constantly employing temporary staffing because they're probably constantly having people on leave in and out and whatever, somebody's sick and so forth, and yet the needs of the cafeteria in a hospital continue to be intense. So that's a big contract they lost. Ms. Clay, maybe the next day went somewhere else. And so she may or may not have lost anything, but her loss is not the same as their loss. How can you explain that? I would assert that both harms are remedial or, sorry, can be remedied. The discrimination claim would be asserted by Clay. White Glove would have a cause of action for sending out, if they had, an African American employee in opposition to the allegedly racist request. So there is a remedy for both sides in this transaction. White Glove was not discriminated against. Clay was. White Glove does have a remedy in law for this alleged conduct. And that's actually something that, while the EEOC guidance is not, it's merely persuasive, it looked to that. That was the, and it's cited by counsel, where a temporary agency got an alleged request to send out employees of only a single race. Instead, as an act of purpose of opposition, it sent out employees of all different races. That set forth a claim for retaliation. That is the claim that could make White Glove whole if they had, if the seduction. You're saying they don't have a cause of action for retaliation here. Yes, Your Honor, because the facts show that they did not purposely oppose. In fact, when they continue. What you just said they did. Methodists asked for a particular race and they sent another. And I apologize. Hypothetically, there is a way for both parties to be remedied. But the problem is White Glove was not discriminated against, and it did not act in purpose of opposition to the allegedly discriminatory demands. But you're sending Ms. Clay. Your Honor, if we look. Methodists cut them off, period. Under your theory of retaliation, that's not purposive. Because, and this is something that was looked at at the district court. The first time that they sent her out, it was because she was the only employee available. The second time they sent her out is because they looked to try and find a Hispanic employee that was available, but because they could not find anyone else, and Clay was the only one available, they sent her out. When they were allegedly told that the chef was mad that Clay was sent out twice, then Linda White, Ms. White, first asked to revive contract negotiations. She then made the remark that's relied upon regarding the chef only wants Hispanics as saying that's a little hard to say sometimes, Jeff, isn't it? But then on two separate occasions, she again sought to revive contract negotiations. This is not an act where she was purposely opposing the allegedly discriminatory requests. In fact, as observed by the district court, in the interactions between White Glove and Jennings, White Glove sought to continue or revive contract negotiations with Methodists by either attempting to accommodate the request for Hispanic employees or two, asking how White Glove could remedy the issues when Methodists . . . It seems like at times they're trying to still get the contract by saying we'll do what you want, we want to keep you happy, you're a potential big customer. At other times it does seem like they're saying, well, what you're doing is wrong. I can't believe you're saying this or something to that effect. So if there's these two competing inferences about what White Glove was doing, why isn't that a fact issue? It's not a fact issue because to have purpose of opposition under Section 1981 and the case law interpreting it, there must be some actual action in opposition to what, to the discriminatory conduct that's taking place. Stray remarks are not sufficient, and that's why when we're looking at purpose of opposition . . . But sending the African American when you've been told don't do that, why isn't that opposition to this discriminatory practice? Because by their own admission, that was not done as an act of opposition, but because she was the only available employee. As this court illustrated in its decision of EEOC versus Rightway, in determining whether there is purpose of opposition, this is a fact-specific inquiry. And we're looking at the context and the setting in which the opposition occurred. Viewing the totality of the circumstances in this case, White Glove was not purposely opposing the allegedly discriminatory conduct. I want to go back to the first claim. If White Glove had a majority stock, shares owned by African Americans, then you think they would have a discrimination claim? I believe it would be a two-part inquiry. First, it would be whether they have a majority of stock or whether they are minority owned. And second, whether that was the basis for the discriminatory conduct. In Body by Cook, this court recognized the imputed racial identity exception that would permit a corporation to assert a third-party claim. And it said, after laying out the elements of discrimination, including that an entity have a race identity, it stated that Body by Cook met this requirement of asserting it had a racial identity by alleging that it was 100% African American-owned body shop and that it was alleged it was discriminated against on that racial basis. So it's not only the ownership. The discrimination has to be about the ownership of the company in that situation? Well, so with corporations, when you have a 100% – so the shareholder issue is a unique one because essentially the corporation is being discriminated against because it is owned by an African – in that case it was one man, an African American man, Mr. Cook. Now Mr. Cook lacks standing to assert a claim on his own behalf. This is the exception that was discussed in Domino's because he's a shareholder, so he cannot assert that harm. Rather, we permit the corporation to assert the discrimination based upon Mr. Cook in that situation because his race was imputed to the corporation and that is why the corporation suffered damages. Now the situation presented here is different because Ms. Clay was an employee, and unlike Mr. Cook in the Body by Cook shop, she could assert that discrimination on her own behalf, and she did in the lower court. But not for the denial of the contract? That's correct, Your Honor. The denial of the contract – That just goes un-remedied. It would not go un-remedied. I believe that in the situation where a company is not discriminated against, it does not have a claim for discrimination, but it may have a claim for retaliation. It does not in this case factually under the circumstances. It is a little strange to say – I mean these statutes are focusing primarily on discrimination. The retaliation sort of was added on later because that's prophylactic to protect the anti-discrimination provisions. It's a little strange to say you can bring retaliation but not discrimination. I just don't know of any other situation where that would be true. Yes, Your Honor. And I would just reiterate that to assert a discrimination claim, one has to be discriminated against. And White Glove was not discriminated against based upon the company. Why would an employer discriminate against a white employee because she was married to a black person? Your Honor, that would fall under association discrimination, which has been recognized. Why isn't this association discrimination? Because White Glove was not – Because I won't enter into a contract with you unless you send me only Hispanic employees. Because White Glove was not discriminated against based upon its association with an African-American employee. The discrimination was suffered by Clay. The contract was – the target of the discrimination was Clay, and that's where the harm can be remedied. If White Glove – The target was the contract. They said we want you to send us only Hispanic employees. We're willing to contract with you only as long as you send us only Hispanic employees. Your Honor, I do not believe the record shows that. That's the allegation. Now, you may differ on the facts, but the allegation is that they were – White Glove was told by Methodists, we only want Hispanic employees. They said that multiple times. And when they didn't send only Hispanic employees, they ended contract discussions. Now, why isn't that purposeful discrimination based on race and contracting practices? Your Honor, I believe that the only discrimination was directed – the only racial discrimination was against Clay. There is no racial discrimination based upon White Glove's – If I were you, though, I would have entered into the contract with White Glove and then just rejected everybody that wasn't Hispanic, but kept the contract going, said, no, no, no, unless you send me Hispanics. Your Honor –  I didn't keep a contract. Yes, Your Honor. Your Honor, I would, again, just reiterate that to have a discrimination claim, you must be the target of the discrimination, or based upon your association with someone of a certain racial minority, to assert that a company can assert a race discrimination just because it employs people – based upon discrimination suffered by an employee is an expansion of Section 1981 that has not been recognized by any court. We've got your argument. Okay. I just want to note that's not what's being alleged here. What's being alleged here is they lost the contract as a result of it, not just that their employees suffered. Right? I mean, that's the allegation. You don't have to agree with it, but that is the allegation. The allegation is they lost the contract  Thank you, Your Honors. Thank you. Just really quickly, Your Honors, Judge Haynes, you were asking about the reason why Methodists said they terminated the contract. If you go to page 8 of our brief, we list the varying reasons different witnesses provided. No, I mean, I saw that. I understand that. So I want to go to what should have been before my argument about purposes of opposition not being an element, and that is there's a fact question whether it was purpose of opposition here. The fact that no one else was available cannot be the deciding factor. As Judge Haynes pointed out, they sent Ms. Clay out several times. It doesn't matter whether they had someone else available or not. Let's assume for a second that White Glove did have a Hispanic employee that they could have sent out. If they nevertheless sent Ms. Clay out, then, of course, I don't think there's any debate that that's purpose of opposition. If they sent the Hispanic out instead, well, there's a very good chance to know that is not purpose of opposition, but here we don't know. If you were writing the opinion that you're asking us to write on the retaliation, how would you phrase what it is you have to do as a company to be able to then state a claim for retaliation? So I would, it's element one, that they engaged in activities protected by Section 1981, and they did that by sending Ms. Clay out there several times. Okay, so you think it's just enough, regardless of the reasoning, even if they, so if they didn't have any other, this was all they had was Ms. Clay, and they kept sending her, that's enough? Yes, well, that's enough for a fact question. Then how does that differ from the, I'm still having trouble how you're distinguishing between the discrimination claim and the retaliation claim, given that they sound very much the same. They are very similar. I would argue that the retaliation claim relates to the retaliation of Methodists against white love for engaging in the protected activity, and that was both initially and then at the very end when they demanded on multiple occasions. How are your damages different? I don't think the damages are different. You can't recover under bed. I can't recover duplicative damages under bed. There's plenty of times where you succeed on multiple causes of action, but there's only one damage, and the damage is we lost the contract. I'm just saying you can't recover damage. You can win under discrimination or retaliation or both, but you can only recover damages under, you have to elect a remedy, right? Yes, Your Honor. Now, it's all under Section 1981, which provides damage, punitive damages, compensatory damages. But you can only recover, you have to elect a remedy? Yes, Your Honor. Okay. Thank you.